UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MOUAWAD NATIONAL COMPANY and
AL-DORAR TRADING ESTABLISHMENT,

                        Plaintiffs,

    -against-

LAZARE KAPLAN INTERNATIONAL INC.,

                        Defendant.

03 Civ. 3103 (RJH)

**MEMORANDUM OPINION
AND ORDER**

      Plaintiffs Mouawad National Company ("Mouawad") and Al-Dorar Trading Establishment ("Al-Dorar") are corporations organized under the laws of Saudi Arabia, each with its principal place of business in Saudi Arabia.  Plaintiffs have brought this diversity action against defendant Lazare Kaplan International Inc. ("LKI"), a Delaware corporation headquartered in New York.  Defendant has moved to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(3) of the Federal Rules of Civil Procedure, or, in the alternative, for summary judgment pursuant to Rule 56 on the ground that it is not a proper party to this lawsuit.  Plaintiffs have moved, pursuant to Rule 15(a), for leave to file a second amended complaint.  For the reasons set forth below, both motions [42] are granted.

### BACKGROUND

      The following facts are drawn from defendant's statement of material facts and plaintiffs' counterstatement and are undisputed unless otherwise noted.  Where the parties disagree, the

facts are construed in favor of plaintiffs. *See Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999).

This diversity action arises from the sale in October 2000 of a processed pink diamond valued at $1.5 million from POCL, N.V. ("POCL"), a Belgian corporation, to Mouawad's purchasing agent, Al-Dorar, in Saudi Arabia. Plaintiffs are jewelers and jewel traders. As set forth in more detail below, plaintiffs were unable to sell the pink diamond and attempted to return it to POCL. When POCL refused to accept the return of the diamond or credit plaintiffs' account, plaintiffs chose to file suit against LKI in the United States, alleging that POCL acted as LKI's agent in the transaction. The Court permitted limited discovery into the relationship between POCL and LKI, after which defendant moved for summary judgment on the ground that POCL was not acting as its agent in the transaction and thus LKI cannot be held liable for POCL's actions.

The Bellataire Diamonds

Some background on processed diamonds and the LKI subsidiaries involved in their manufacture and sale is helpful in understanding the issues raised in this motion. A subsidiary of General Electric Company (hereinafter referred to simply as "GE") developed a patented process that uses a proprietary high pressure, high temperature ("HPHT") technique to process brown Type IIa diamonds into colorless—and much more valuable—diamonds. (Def. 56.1 Statement ¶ 3.) On March 1, 1999, Pegasus Overseas, Ltd. ("Pegasus"), a wholly owned subsidiary of LKI incorporated in the Bahamas, announced that it had entered into an exclusive agreement with GE to sell these diamonds, known as "Bellataire" diamonds.[1] (Moryto Decl. in Support of Def.'s

---

[1] Defendant claims that Pegasus was formed for the sole purpose of entering into this venture with the GE subsidiary. (Def. 56.1 Statement ¶ 4.)

2

Mot. to Dismiss ("Moryto Decl."), Ex. C.)  Under the agreement, Pegasus and GE share in the revenues produced through the marketing of the diamonds.  (Def. 56.1 Statement ¶ 3.)

Pegasus formed a wholly owned subsidiary, Pegasus Overseas LLC ("POLLC"), to facilitate the invoicing, shipping, and transfer of the Bellataire diamonds.  (*Id.* ¶ 8.)  LKI also formed two companies to market the Bellataire diamonds:  POCL for overseas markets and Bellataire Diamonds, Inc. ("BDI"), a direct subsidiary of LKI, for domestic markets.  (*Id.* ¶¶ 9–10.)  POCL, a Belgian corporation, is a direct subsidiary of LK Belgium, which is itself an indirect subsidiary of LKI and is incorporated in Belgium.[2]  (*Id.*)  POCL's business operations are managed out of the Belgian office of LK Belgium.  POLLC and BDI are Delaware corporations located in LKI's offices in New York.  (*Id.* ¶¶ 12–14.)  POCL, Pegasus, and POLLC share corporate officers and directors with LKI:  The president of LKI, Leon Tempelsman, is a director and president of Pegasus and a director of POCL.  (*Id.* ¶ 5, 12; R. Mouawad Aff. in Support of Pls.' Opp'n ("R. Mouawad Aff.") ¶ 7–8; Mot. 13.) The vice president and chief financial officer of LKI, William Moryto, serves as the secretary-treasurer of Pegasus and is also a director of POCL. (Def. 56.1 Statement ¶ 5, 12; Moryto Decl. ¶ 1.)  In addition, the vice president for sales at LKI, Chuck Meyer, is the managing director of BDI. (Def. 56.1 Statement ¶ 14.)  Marianne Georges, an employee in the Belgian office of LK Belgium, provides services to POCL.  (*Id.* ¶ 14.)

The Dispute over the Return of the Pink Diamond

At the time of Pegasus's announcement, plaintiffs were already customers of LK Belgium.  (*Id.* ¶ 3.)  In June 1999, Robert Mouawad, president of Mouawad and Al-Dorar and a

---

[2] LK Belgium is a wholly owned subsidiary of LK Europe, a Delaware corporation.  LK Europe, in turn, is a wholly owned subsidiary of defendant LKI.  (Kailas Aff. in Support of Pls.' Opp'n, Aug. 12, 2005 ("Kailas Aff."), Ex. 2; Moryto Decl. in Support of Def.'s Mot., Aug. 12, 2005 ("Moryto Decl."), Ex. A.)

famous jeweler in his own right, expressed to Georges his interest in merchandising the Bellataire diamonds. (*Id.* ¶ 20.) The discussions between Georges and Robert Mouawad culminated on May 12, 2000, in a written agreement (the "May 2000 Agreement") in which POCL granted Al-Dorar the exclusive right to sell colorless Bellataire[3] diamonds in the Middle East and Asia and also gave Mouawad the right to sell finished jewelry containing Bellataire diamonds at its retail stores throughout Europe. (Moryto Decl., Ex. D; Compl. ¶ 7.) Over the next eighteen months, Al-Dorar purchased over $22.7 million of colorless Bellataire diamonds. (Compl. ¶ 8.) POCL invoiced each of these purchases, and Al-Dorar remitted payment directly to POCL. (Moryto Decl. ¶ 23 & Ex. E.).[4]

During the period in which the parties were negotiating the May 2000 Agreement, Georges offered Robert Mouawad a large kite-shaped pink Bellataire diamond weighing over 14.9 carats and having a wholesale value of over $1.5 million. (Compl. ¶ 10.) LK Belgium had purchased the rough diamond in September 1998 and sold the diamond to POLLC in July 1999, at which time it underwent GE's proprietary HPHT process. (Kailas Aff. in Support of Pls.' Opp'n ("Kailas Aff.") Ex. 21, at 3.) Robert Mouawad claims that he was hesitant to purchase the pink diamond because he was "unsure about the marketability of colored processed diamonds." (R. Mouawad Aff. ¶ 13.) According to plaintiffs, however, he and Georges reached an oral agreement that POCL would accept the return of the pink diamond should he be unable to sell it. (*Id.*; Compl. ¶ 10.) In May 2000, after the stone was processed by GE and inscribed with Mouawad's hallmark, it was shipped "on behalf of POCL N.V." to "Mouawad S.A." under cover

---

[3] The agreement is for "GE/POL" diamonds, which are synonymous with Bellataire diamonds. (Moryto Decl., Ex. C.)

[4] The complaint alleges that these diamonds were purchased from LKI (Compl. ¶ 8), but plaintiffs do not dispute that POCL invoiced Al-Dorar for the diamonds and that Al-Dorar remitted payment directly to POCL. (Def. 56.1 Statement ¶ 24.)

of POLLC's memorandum dated May 10, 2000.  (Kailas Aff. Ex. 21, at 3; Pascal Mouawad Aff. in Support of Pls.' Opp'n  ("P. Mouawad Aff.") Exs. 1, 5.)  On that same day, POCL invoiced the sale of the pink diamond for $1,528,832 to Al-Dorar.  (Kailas Aff. Ex. 25; Def. 56.1 Statement ¶ 25.)  Al-Dorar evidenced its acceptance of the stone by wiring payment into POCL's account.  (Kailas Aff. Ex. 21, at 3.)  Thereupon, POLLC invoiced POCL for the stone (Kailas Aff. Ex. 26), and POCL tendered payment to POLLC.  (Kailas Aff. Ex. 21, at 3.)  POCL earned a 2.5-percent commission on each sale of the colorless and pink Bellataire diamonds to Al-Dorar.  (*See* Kailas Aff. Ex. 20, 24–31; *see also* Tempelsman Dep. 19 ll. 8–11, Kailas Aff. Ex. 18 (confirming that POCL earned a commission).)

       Although one of Mouawad's preferred customers took the pink diamond on a trial basis, the customer later returned it.  (Compl. ¶ 11.)  Consequently, in late 2001, Robert Mouawad notified Georges of his intention to return the pink diamond to her for a credit to his account.  (*Id.* ¶ 29.)  Plaintiffs were already embroiled in a dispute with Georges over the return of several colorless diamonds purchased under the May 2000 Agreement.  Since September 2000, plaintiffs had argued to Georges that they had the right, based on established practice in the diamond trade, to exchange ten percent of the colorless stones that they had already purchased.  (*Id.* ¶ 26; Kailas Aff. Ex. 8.)  As the dispute over the return of the pink and colorless diamonds dragged on into 2002, Georges asked Moryto and Tempelsman to communicate with plaintiffs.  (*Id.* ¶ 30.)  Eventually others within the Lazare Kaplan organization and GE got involved as well.  (*Id.* ¶ 34.)  Having failed to reach a resolution, plaintiffs filed the instant action on May 2, 2003, seeking a credit for the return of the pink diamond as well as four colorless Bellataire diamonds plaintiffs had already returned to POCL.  (*Id.* ¶ 36.)

The Suit in Belgium

On March 26, 2004, POCL filed suit against plaintiffs in a Belgian court seeking payment on outstanding invoices in the amount of $1,326,110.02 and the collection of the four colorless diamonds previously returned by plaintiffs to POCL.  In the Belgian action, which concerned only the colorless diamonds, Mouawad and Al-Dorar took the position that the Belgian court did not have jurisdiction because clause eight of the May 2000 Agreement provides, "This agreement is governed by Swiss law and is subject to the jurisdiction of the Courts of Geneva." (Moryto Decl., Ex. D, at 2.)  On September 22, 2005, the Belgian court granted Mouawad and Al-Dorar's motion and dismissed the action, stating that "the lawfully authorized Courts in Geneva have jurisdiction to hear these disputes."  (Def.'s Letter to the Court, Oct. 7, 2005, Ex. 1, at 6.)

Subsequently, defendant LKI moved to dismiss the Amended Complaint for (1) lack of subject matter jurisdiction and improper venue, pursuant to Rules 12(b)(1) and 12(b)(3) of the Federal Rules of Civil Procedure, on the ground that plaintiffs are bound to submit this controversy for decision to the courts of Switzerland, or, in the alternative, (2) for summary judgment, pursuant to Rule 56, on the ground that there are no facts sufficient to support plaintiffs' contention that defendant was a party to the contract underlying this breach-of-contract claim.

**DISCUSSION**

1.   **Motion to Dismiss**

Defendant argues that because the forum selection clause in the May 2000 Agreement applies to plaintiffs' claims, the Court should dismiss this action in favor of plaintiffs' chosen forum of Switzerland.  "The Supreme Court has not specifically designated a single clause of

6

Rule 12(b) as the 'proper procedural mechanism to request dismissal of a suit based upon a valid forum selection clause,'" nor has the Second Circuit.  *See Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 822 (2d Cir. 2006) (quoting *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24, 28 (2d Cir. 1997)).  In *New Moon Shipping*, instead of analyzing such a motion under Rule 12(b)(1) or 12(b)(3), the Second Circuit established a separate framework for analyzing these cases.  121 F.3d at 29.  Under this framework, the moving party must first show evidence of "an apparently governing forum selection clause."  *Asoma Corp.*, 467 F.3d at 822.  The burden is then on the plaintiff who brought suit in a forum other than the one designated by that clause to "make a strong showing to defeat that contractual commitment."  *Id.*  That burden is "analogous to that imposed on a plaintiff to prove that the federal court has subject matter jurisdiction over his suit or personal jurisdiction over the defendant."  *New Moon Shipping*, 121 F.3d at 29.

Here, the parties agree that the May 2000 Agreement does not govern the sale of the pink diamond.  Nonetheless, defendant argues that because the Amended Complaint seeks a credit for the return of the four colorless diamonds in addition to the pink diamond (Compl. ¶¶ 16–17, 19, 21), the claims in this case *are* governed by the May 2000 Agreement.  Since filing their Amended Complaint, plaintiffs have represented to this Court that the pink diamond is the "focus of the dispute."  (*See* Pls.' Letter to the Court, Oct. 11, 2005, at 1–2).  However, plaintiffs have not clearly abandoned their claims related to the colorless diamonds.  They have not sought leave to file a second amended complaint withdrawing their claims regarding the colorless diamonds.  Moreover, plaintiffs have argued previously that the four colorless diamonds are properly part of this dispute, notwithstanding the forum selection clause, because POCL initially credited Mouawad's account for the return of the four colorless diamonds but withdrew the credit after

7

plaintiffs attempted to return the pink diamond. (Pls.' Letter to the Court, Jan. 19, 2005, at 2.) The withdrawal of credit is by itself insufficient to overcome the presumption that the forum selection clause in the May 2000 Agreement is applicable and enforceable with respect to the colorless diamonds, yet plaintiffs proffer no other evidence to support their claim that New York is the proper venue for a suit involving the colorless diamonds. Accordingly, to the extent that the Amended Complaint states claims related to the colorless diamonds, those claims are dismissed pursuant to Rule 12(b).

2.   **Motion for Summary Judgment**

Defendant also moves for summary judgment on the ground that POCL was not acting as its agent when POCL sold the pink diamond. A disclosed principal[5] may be liable on a contract in which it is not a named party, provided that the contract is made by an agent acting within its authority, in the proper form, and with the understanding that the principal is a party. *See* Restatement (Second) of Agency ("Restatement") §§ 144, 147, 149 (1958); *Carte Blanche PTE., Ltd. v. Diners Club Int'l, Inc.*, 758 F. Supp. 908, 919 (S.D.N.Y. 1991).

  a.   *Legal Standard*

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions . . . , together with the affidavits, . . . show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

---

[5] The Court accepts for present purposes plaintiffs' representation that they believe LKI was a disclosed principal, and that their use of the term "undisclosed principal" in their June 14, 2004 letter was a simple mistake.

8

"The question of whether an agency relationship exists is a mixed question of law and fact." *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 301 (S.D.N.Y. 2005) (citing *Cabrera v. Jakabovitz*, 24 F.3d 372, 385 (1994)). Unless the material facts from which agency is to be inferred are undisputed, the question of agency should be submitted to the jury. *Id.*; *Slotkin v. Citizens Cas. Co.*, 614 F.2d 301, 317 (2d Cir. 1979). "However, where the material facts from which agency is to be inferred are not in dispute, the question of agency is not open to doubt, and only one reasonable conclusion can be drawn from the facts in the case, agency is a question for the court." *Lumbermens Mut. Cas. Co.*, 388 F. Supp. 2d at 301 (internal quotation marks and quotation omitted).

    b.    *Analysis*

Under New York law,[6] a corporate parent is not automatically liable for the acts of its wholly owned subsidiary, *Beck v. CONRAIL*, 394 F. Supp. 2d 632, 637 (S.D.N.Y. 2005), even where the parent and subsidiary corporations have interlocking directorates, *Manchester Equip. Co. v. American Way & Moving Co.*, 60 F. Supp. 2d 3, 7 (E.D.N.Y. 1999); *see also Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988). However, a corporate parent may be held to account for the wrongs of its subsidiary (1) under an alter ego or veil-piercing analysis where the corporate parent has disregarded the subsidiary's corporate form, or (2) under traditional principles of agency. *Maung Ng We v. Merrill Lynch & Co.*, No. 99 Civ. 9687 (CSH), 2000 U.S. Dist. LEXIS 11660, 2000 WL 1159835, at *3 (S.D.N.Y. Aug. 15, 2000); *Royal Indus. v. Kraft Foods*, 926 F. Supp. 407, 413 (S.D.N.Y. 1996) ("[J]ust as one corporation can hire another to act as its agent, a parent can commission its subsidiary to do the same."); Restatement § 14M,

---

[6] The parties' briefs assume that New York law applies to this analysis. *See, e.g.*, Mot. 12; Opp'n 11. Such "implied consent . . . is sufficient to establish choice of law." *Krumme v. Westpoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (quoting *Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)).

Reporter's Notes ("It is useful to distinguish situations in which liability is imposed on a parent because of the existence of the agency relation, in our common-law understanding of that relation, from cases in which the corporate veil of the subsidiary is pierced for other reasons of policy."). Nevertheless, "[i]t is well settled that New York courts are reluctant to disregard the corporate entity." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989) (collecting cases).

A party seeking to hold a corporate parent liable for the acts of its subsidiary using a veil-piercing analysis must prove that the parent exercised "complete domination" over the subsidiary with respect to the transaction at issue. *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997). "Control is the key. The parent must exercise complete domination 'in respect to the transaction attacked' so that the subsidiary had 'at the time' no separate will of its own . . . ." *Am. Protein Corp.*, 844 F.2d at 60. In considering whether a parent corporation exercised "complete domination" over its subsidiary, courts consider such factors as:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*MAG Portfolio Consult, GmbH v. Merlin Biomed Group, LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (quoting *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997)). In addition, "such domination must have been used to 'commit fraud or wrong' against plaintiff, which proximately caused plaintiff's injury." *Am. Protein Corp.*, 844 F.2d at 60 (citing *Lowendahl v. Baltimore & Ohio R.R.*, 287 N.Y.S. 62, at *33 (N.Y. App. Div. 1936)); *see also New York Ass'n for Retarded Children, Inc. v. Keator*, 606 N.Y.S.2d 784, 785 (N.Y. App. Div. 1993) (holding

that plaintiff must show "use of this domination and control to commit fraud or wrong or any other dishonest or unjust act").

In contrast, a party seeking to hold a corporate parent liable for the acts of its subsidiary using an agency analysis need not prove that the parent used the subsidiary to "commit a fraud or wrong" against plaintiff. Instead, an agency relationship is established where there is evidence of "(1) consent; (2) fiduciary duty; (3) absence of gain or risk to the agent; (4) control by the principal; and (5) power of the agent to alter the legal relations between the principal and third persons and between the principal and himself." *Exxon Corp. v. Central Gulf Lines*, 717 F. Supp. 1029, 1031 (S.D.N.Y. 1989); *G.D. Searle & Co. v. Medicore Communications*, 843 F. Supp. 895, 904 (S.D.N.Y. 1994) ("Agency is the relationship that results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."); *Royal Indus.*, 926 F. Supp. at 413 ("The theory behind any such agency claim is that the subsidiary's acts were, in both form and substance, those of the parent. Thus, there is no veil to pierce—the parent is the only party in interest."). Within the factual context presented in this case, the last two elements—control and the agent's power to alter the legal relations of the principal—are the most important.

The principal's power to control the agent is an essential element of an agency relationship. *In re Shulman Transport Enter., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984); *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 301 (S.D.N.Y. 2005); *E.B.A. Wholesale Corp., v. S.B. Mechanical Corp.*, 512 N.Y.S.2d 130, 131 (N.Y. App. Div. 1987). "The essence of control in an agency sense is in the *necessity* of the consent of the principal on a given matter." *Maung Ng We*, 2000 WL 1159835, at *7. The principal's consent may be manifested by written or spoken words or any other conduct of the

11

principal, directed at the agent in the case of actual authority, or at a third person in the case of apparent authority. *See Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 69 (2d Cir. 2003) (stating that actual authority "exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act," while "apparent authority arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf" (quotations omitted)). Control alone is insufficient to establish the existence of an agency relationship, however. The agent's power to alter legal relations between the principal and third persons is also an essential element of the agency relationship. *See Tip Top Farms, Inc. v. Dairylea Cooperative, Inc.*, 114 A.D.2d 12, 22 (N.Y. App. Div. 1985) (stating that, in addition to control, the agent must be "placed in a position to affect or alter the legal relations between the principal and third parties in matters within the scope of the agency"); *see also* Restatement § 12 ("An agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself."); 3 Am. Jur. 2d Agency § 68 ("The authority of the agent is the very essence of the principal and agent relationship. Unless otherwise agreed, it includes only authority to act for the benefit of the principal, and the source of the authority is always the principal, never the agent." (footnotes omitted)). Indeed, the entire purpose of an agency relationship is to empower the agent to take actions "*on behalf of and for the benefit of the principal*—not the agent." *Maung Ng We*, 2000 WL 1159835, at *9 (quotation omitted) (collecting cases in which New York state and federal courts have held that the agent acts at the behest and for the benefit of the principal). The Restatement gives several examples of ways in which an agent may alter the legal relations of the principal with third persons:

> The exercise of this power may result in binding the principal to a third person in contract; in divesting the principal of his interests in a thing, as where the agent sells the principal's goods; in the acquisition of new interests for the principal, as where the agent buys goods for the principal; or in subjecting the principal to a tort liability, as where a servant, while acting within the scope of his employment, injures a third person.

Restatement § 12, cmt. a. Before a principal can confer actual or apparent authority on another to act on its behalf, the principal must itself possess the power that it is attempting to confer on the agent. *See* 3 Am. Jur. 2d Agency § 9 ("Any person who is sui juris and has capacity to affect his or her legal relationships by giving consent to a delegable act or transaction may authorize an agent to act for him or her with the same effect as if such person were to act in person."). It is axiomatic that where a principal does not possess the power to bind itself to a third person in contract, there is no power that the principal can confer on an agent that will enable the agent to enter the contract on the principal's behalf. Where the purported agent lacks the power to alter the legal relations of the principal, evidence of consent, fiduciary duty, absence of risk to the agent, and control by the principal are insufficient to establish an agency relationship. Such evidence might, however, demonstrate the presence of an alter ego relationship.

Here, plaintiffs argue vigorously that LKI should be a party to this action because the conduct of Georges, Tempelsman, Moryto, and Meyer—both before and after the sale of the pink diamond—led plaintiffs to believe that LKI was the principal and that POCL was merely acting as LKI's sales agent. For instance, after Robert Mouawad expressed an interest in the Bellataire diamonds, Georges invited Robert Mouawad to meet with Tempelsman, whom Georges described as the "president of LKI." (R. Mouawad Aff. ¶ 7 & Ex. 1.) Plaintiffs claim that when Robert Mouawad met Tempelsman in Geneva, Tempelsman introduced himself as the "president of LKI," not a director of POCL, and stated that "all major decisions pertaining to our common business would be made by his New York headquarters." (Compl. ¶ 8–9.) Georges

13

often stated that she needed to seek advice from New York or Tempelsman himself (R. Mouawad Aff. ¶ 10–11), and plaintiffs have identified specific instances demonstrating Georges's dependence on LKI. (*See, e.g.,* R. Mouawad Aff., Ex. 2 (Georges copied Tempelsman on an e-mail on Feb. 23, 2000 regarding proposed terms for the May 2000 Agreement); R. Mouawad Aff., Ex. 4 (fax dated March 25, 2000 in which Georges told Robert Mouawad requesting information for her report to Tempelsman); Kailas Aff. Ex. 7 (fax from Georges to Tempelsman requesting Tempelsman's advice about the timing of a counteroffer to Robert Mouawad's proposed price on the pink diamond).) Tempelsman also testified at his deposition that Georges kept him apprised of "all of her selling activity." (Kailas Aff., Ex. 13.) When the dispute over the return policy began, Georges faxed Mouawad's letter to Tempelsman with the word, "Help!" at the top. (Kailas Aff. Ex. 8.) In addition, when Robert Mouawad's son, Pascal Mouawad, first contacted Georges regarding the dispute over the return of the pink diamond, she allegedly told him "to speak with the people in New York because they made all major decisions." (P. Mouawad Aff. ¶ 9.) Pascal then met several times in New York with Meyer and Moryto. (*Id.* ¶ 10.)

On the other hand, plaintiffs' own actions are arguably inconsistent with their alleged belief that they were dealing with LKI. It is undisputed that Robert Mouawad and Georges negotiated the sale of the pink diamond. (R. Mouawad Aff. ¶ 13.) POCL invoiced all of the Bellataire diamond sales, including that of the pink diamond, and Al-Dorar remitted payment directly to POCL. (Moryto Decl. ¶ 23 & Ex. E.). In addition, when Robert Mouawad attempted to return the diamond, he contacted Georges first. (R. Mouawad Aff. ¶ 14; Compl. 12.)[7]

---

[7] Although not directly on point, the undisputed facts regarding the parties' dealings under the May 2000 Agreement also suggest that plaintiffs understood that they were dealing primarily with POCL, not LKI. For instance, only POCL and Al-Dorar were parties to the May 2000

14

Nevertheless, even assuming that there is a genuine issue of material fact as to whether LKI controlled POCL, POCL could not have been acting on LKI's behalf when it sold the pink diamond for the simple reason that LKI never owned the pink diamond. LK Belgium purchased the rough diamond and then sold it to POLLC, which sold it to POLC after the purchase of the diamond by plaintiffs was finalized. Plaintiffs have produced no evidence that LKI directly benefited from the sale of this diamond. Because LKI could not have sold the pink diamond itself, LKI could not have conferred on POCL the power to sell the pink diamond on its behalf. Thus, as a matter of law, POCL was not acting as an agent of LKI when POCL sold the pink diamond to plaintiffs.

Plaintiffs contend, however, that POCL earned a 2.5-percent commission on the sale of the pink diamond and thus it was an agent in the transaction. (Opp'n 8, 13.) A party who buys goods for resale to a third person is not considered an agent in the transaction unless "the parties agree that his duty is to act primarily for the benefit of the ones delivering the goods for him." Restatement § 14J. Although the fact that POCL earned a commission supports POCL's agency status, other factors, such as the fact that title to the diamonds passed to POCL, suggest that POCL acted primarily for its own benefit. *Id.* at cmt. b (1)–(7); *see also Royal Indus. v. Kraft Foods*, No. 94 Civ. 9334 (CSH), 1998 U.S. Dist. LEXIS 1770, 1998 WL 67671, at *3 (S.D.N.Y. Feb. 18, 1998), *aff'd*, 164 F.3d 619 (2d Cir. 1998) (holding that evidence that a corporate subsidiary negotiated sales of its corporate parent's goods was insufficient to establish that the subsidiary was the parent's agent). Nevertheless, assuming for the sake of argument that POCL

---

Agreement for the distribution of colorless Bellataire diamonds. (Moryto Decl., Ex. D.) On April 5, 2002, Mouawad shipped four diamonds to POCL directly for return. (Moryto Decl. ¶ 25 & Ex. F; Def.'s Letter to the Court, Oct. 7, 2005, Ex. 1, at 2.) On June 20, 2002, plaintiffs sent POCL a letter notifying POCL that plaintiffs intended to return four (of six) disputed colorless diamonds (*id.* ¶ 31), and plaintiffs did in fact return these diamonds to POCL, which is still holding them (P. Mouawad Aff. Ex. 9).

was someone's agent in this transaction, it does not follow that LKI was the principal. POLLC and LK Belgium are more likely candidates as both of these entities held title to the pink diamond and presumably profited from the sale to Al-Dorar. On the other hand, neither of these entities makes a very satisfactory principal: LK Belgium presumably profited only from the sale of the rough diamond, which was far less valuable than the processed stone, and the evidence available at this stage of the case suggests that POLLC was acting as Pegasus's agent.[8] Ironically, plaintiffs have rejected the argument that Pegasus was the principal in this transaction on the ground that "Pegasus was *never* the owner of the diamonds at issue in this action." (Opp'n 4.)

On these facts, it seems as if plaintiffs would have more success holding LKI responsible for the actions of POCL using a veil-piercing analysis instead of an agency analysis. A party seeking to hold a corporate parent liable for the actions of its subsidiary under an agency theory necessarily concedes that the underlying obligation belongs to the parent. In contrast, under a veil-piercing theory, the party "seeks to hold the parent liable on the theory that the parent fraudulently induced the subsidiary to incur the obligation." *Royal Indus.*, 926 F. Supp. at 412; *accord Maung Ng We*, 2000 WL 1159835, at *3. Here, it could be argued that LKI should be held to account on the contract with Al-Dorar because LKI completely dominated POCL. Evidence of this domination includes the fact that: POCL did not have its own offices but rather shared office space and telephone numbers with LK Belgium; Tempelsman and Moryto,

---

[8] For instance, defendant claims that Pegasus and GE share in the revenues from the sale of Bellataire diamonds, and that the purpose of POLLC, which does not have its own offices, is merely to facilitate the invoicing, shipping, and transfer of the Bellataire diamonds. The parties have also referred to a draft "Agency Agreement" between Pegasus and POLLC. (Opp'n 4 n.4, 19 n.12; Letter from Def. to Pls., Apr. 8, 2005, at 3; Kailas Aff. Ex. 21; Tempelsman Dep. 145–49, Kailas Aff. Ex. 23.) Defendant has previously argued that "Pegasus was at all times the principal in these transactions, and that LKI, POLLC and LK Belgium would be acting, if at all, merely as agents for Pegasus's benefit." (Kailas Aff. Ex. 21, at 2.)

president and vice president of LKI respectively, were directors of POCL; POCL had no employees, and its business was conducted through Marianne Georges, an employee of LK Belgium; and Georges consulted with Tempelsman and other members of the Lazare Kaplan organization on many of the key decisions regarding the sale of the pink diamond, including the price and later the dispute over the diamond's return.  In addition, plaintiffs have alleged that they would not have purchased the pink diamond from POCL if they had believed a Lazare Kaplan entity other than LKI itself was the principal.

In fact, although the Amended Complaint describes POCL as LKI's "European agent" (Compl. ¶ 3), plaintiffs earlier sought discovery to support an alter-ego theory of their case, stating:

> What plaintiffs have learned from the limited document production . . . support[s] our contention that LKI, and not POCL, is the real party in interest in this litigation, that LKI treated its subsidiaries interchangeably, that POCL was a mere sham with no employees and that LKI is the undisclosed principal[9] of all these transactions. . . . Plaintiffs are not seeking information on other LKI subsidiaries in order to sue such other subsidiaries, but merely to demonstrate that in their interactions the subsidiaries, including POCL, did not observe corporate formalities and were mere shams, with LKI the ultimate party in control.

(Pls.' Letter to the Court, June 14, 2004, at 1–2.)  Plaintiffs abandoned their alter-ego theory only after defendant pointed out that bringing LKI into this lawsuit under an alter-ego theory would destroy diversity jurisdiction.  (*See* Def.'s Opp'n to Pls.' Motion to Compel, July 30, 2004).  If plaintiffs—both Saudi Arabian corporations—were to argue once again that LKI was the alter ego of POCL, POCL's Belgium citizenship would be added to LKI's New York citizenship, divesting this Court of diversity jurisdiction.  *See In re Air Disaster Near Cove Neck*, 774 F. Supp. 718, 720-721 (E.D.N.Y. 1991) (holding that "in the cases in which the subsidiary's domicile is imputed to the parent, the parent acquires an additional domicile for jurisdictional

---

[9] *See supra* note 5.

17

purposes")[10]; *Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 581 (2d Cir. 2002) ("Diversity is lacking . . . where the only parties are foreign entities, or where on one side there are citizens and aliens and on the opposite side there are only aliens.").

As noted above, when the facts are not in dispute, the question of agency is for the court. Here, the Court has found as a matter of law that LKI lacked the power to sell the pink diamond and thus it could not have conferred this power on POCL. Hence, LKI was not POCL's principal in this transaction and cannot be held liable for the actions of POCL. Summary judgment for defendant is granted on this issue.

3.  **Leave to Amend**

Plaintiffs argue that, if LKI was not the principal, "the only other party that could have been the principal was POLLC," a Delaware corporation. (Opp'n 4.) Plaintiffs therefore have requested that the Court grant them leave to file a second amended complaint to name POLLC as the defendant. As noted above, the evidence currently before the Court suggests that POLLC was acting as an agent itself, and thus it may not be a proper party to this suit. *See Seguros Banvenez, S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 860 (2d Cir. 1985) ("When an agent makes a contract for a disclosed principal, it becomes neither a party to the contract nor liable for the performance of the contract."); *see also New York Ass'n for Retarded Children, Inc.*, 606 N.Y.S.2d at 785 ("It is well established that an agent of a disclosed principal does not, absent express agreement, become liable individually on a contract relating to the agency."); *but see* Restatement § 322 ("An agent purporting to act upon his own account, but in fact making a

---

[10] "[I]f a parent were sued as a result of activities of a subsidiary, the alter ego doctrine would attribute the subsidiary's place of incorporation to the parent even if such resulted in destroying complete diversity." *Grunblatt v. UnumProvident Corp.*, 270 F. Supp. 2d 347, 353 (S.D.N.Y. 2003) (quoting *Panalpina Welttransport GmBh v. Geosource, Inc.*, 764 F.2d 352, 355 (5th Cir. 1985)).

18

contract on account of an undisclosed principal, is a party to the contract."). Nevertheless, as plaintiffs have not had discovery into the relationships between POLLC and LKI's other subsidiaries, the Court grants plaintiffs leave to amend in the event that plaintiffs believe that any claims against POLLC "are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. Proc. 11.

## CONCLUSION

For the foregoing reasons, plaintiffs' Amended Complaint [6] is dismissed without prejudice. Plaintiffs have thirty (30) days from the date of this Memorandum Opinion and Order to file a second amended complaint.


SO ORDERED.
Dated: New York, New York
       March 6, 2007

_____
Richard J. Holwell
United States District Judge

contract on account of an undisclosed principal, is a party to the contract."). Nevertheless, as plaintiffs have not had discovery into the relationships between POLLC and LKI's other subsidiaries, the Court grants plaintiffs leave to amend in the event that plaintiffs believe that any claims against POLLC "are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. Proc. 11.

## CONCLUSION

For the foregoing reasons, plaintiffs' Amended Complaint [6] is dismissed without prejudice. Plaintiffs have thirty (30) days from the date of this Memorandum Opinion and Order to file a second amended complaint.

SO ORDERED.
Dated: New York, New York
      March 6, 2007

Richard J. Holwell
United States District Judge